Richard PRITZ and James F. Honzik, Plaintiffs,

v.

Keith HACKETT and Francis Retelle, Defendants.

No. 76–C–478.

United States District Court, W. D. Wisconsin.

Nov. 17, 1977.

John A. Hamell, Jr., of Rausch, Hamell, Ehrle & Sturm, S. C., Milwaukee, Wis., for plaintiffs.

Conrad H. Johnson, of Schlotthauer, Johnson, Mohs & Rusch, Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

Plaintiffs filed this action under 42 U.S.C. § 1983 to recover money damages for false arrest and imprisonment by defendant police officers. This court has jurisdiction pursuant to 28 U.S.C. § 1343.

The case is now before the court on cross motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs claim that the arrests, lacking both warrants and probable cause, were unlawful. Plaintiffs also claim that defendants' refusal to release the plaintiffs following the arrests, while refusing to accept and verify plaintiffs' identification, constituted false imprisonment. Defendants contend that the arrests were supported by probable cause or, in the alternative, that defendants' reliance upon information provided by the Milwaukee Police Department justified the arrests. Defendants further contend that their refusal to release plaintiffs for a time and their response to plaintiffs' offer of identification were reasonable.

### Facts

For the purpose of plaintiffs' and defendants' motions I find that there is no genuine issue of material fact as to the following:

1. On September 9, 1975, the Milwaukee Police Department notified the Madison Police Department by teletype message that three suspects wanted by the Milwaukee police for the armed robberies of two Milwaukee savings and loan associations were

believed to be in the Madison area. The suspects were identified as a white female, Mary Schimel, and two white males, Gregory Brundage and Leonard Miller. Brundage was described as standing 5'9", weighing 150 pounds, having brown hair and an acne complexion. Miller was described as standing 5'5", weighing 118 pounds, having sandy hair and a mole on his cheek. The hair of one of the two was described as shoulder length.

2. Plaintiff James Honzik was 5'11", weighed 150 pounds, had brown hair and brown eyes, and had no mole or acne complexion. Plaintiff Richard Pritz was 5'9", weighed 135 to 140 pounds, had brown hair, and had no mole or acne complexion.[1]

3. Milwaukee police also provided descriptions of two vehicles thought to have been involved in the robberies: a red 1963 Ford and a black or silver Fiat.[2] Madison police found a Fiat at the Lake Street parking ramp in Madison, disabled the automobile and, upon request from the Milwaukee police, maintained surveillance of the vehicle.

4. On September 9, 1975, plaintiffs Honzik and Pritz drove Gregory Brundage, a friend who had learned he was wanted by the Milwaukee police, from Madison to Milwaukee so that Brundage could speak with Honzik's father, a lawyer. Honzik's father then made arrangements through a Milwaukee County Assistant District Attorney, who was an uncle of plaintiff Honzik, for Brundage to turn himself over to the Milwaukee police the following morning.

5. Plaintiffs Honzik and Pritz, along with Mary Schimel, the girlfriend of Gregory Brundage and one of those suspected in the robberies, then drove from Milwaukee to Madison in a yellow Duster. Honzik and Pritz drove Schimel to her car, the Fiat which was parked at the Lake Street ramp and which was under police surveillance. They arrived at the parking ramp at approximately 3:15 a. m. on September 10, 1975. When Schimel could not start her car, Honzik and Pritz exited the Duster and approached the Fiat in order to assist Schimel in starting it.

6. At that moment, seven Madison police officers, including defendant Retelle but not including defendant Hackett, with guns drawn, approached Honzik, Pritz, and Schimel, ordered them to freeze, placed them under arrest, commanded them into a prone position, handcuffed them, searched them, and took them to the Madison police station. Defendant Hackett was on duty at the police station at the time and was the officer responsible for the actions then taken at the station concerning the plaintiffs, and defendant Retelle also participated in these actions. No weapons were discovered on the plaintiffs. Plaintiffs did not resist the arrests. No warrants had been issued for the arrests of Brundage, Miller, Schimel, Pritz or Honzik.

7. Upon their arrests, plaintiffs denied that they were the men wanted by the Milwaukee police. Honzik and Pritz offered their drivers' licenses to show they were not Brundage and Miller, the persons named as suspects by the Milwaukee police.[3] At approximately 3:30 a. m., defend-

1. The information in paragraph 2 with respect to Pritz' weight and color of hair as of the time of the the arrest is based on Pritz' deposition testimony. The remainder of the information is based upon an affidavit by plaintiff's attorney. It is a dubious practice for an attorney for a party to undertake to testify as a witness. Moreover, the affidavit refers to plaintiffs' appearances as of May 18, 1977, not September 10, 1975. Also, the affidavit alleges that Pritz' hair is black, whereas Pritz' testimony is that his hair is brown. Nevertheless, since the only question raised by defendants in this connection has to do with the color of Pritz' hair, I

have decided to accept these descriptions as accurate as of September 10, 1975.

2. No license number, registration number, style or model is included in the evidence presented in support of the motions. These details, mentioned solely in the plaintiffs' brief, have not been properly submitted in accordance with Rule 56(e) and therefore cannot be considered by the court.

3. The affidavit of plaintiffs' attorney alleges that plaintiffs also showed defendants picture identifications from the University of Wisconsin-Madison campus, but there is nothing in the

ant Hackett relayed to Milwaukee the information obtained from Honzik and Pritz about their identity. The Milwaukee police requested that Hackett hold the plaintiffs until a positive identification could be made. The Milwaukee officer stated that detectives of that department would drive to Madison with fingerprints and photographs to verify plaintiffs' identification.

8. Plaintiff Honzik, while in custody in Madison, provided the police with the names of his father and his uncle, the assistant district attorney, both in Milwaukee. The defendants did not pursue this information. Honzik also gave the Madison police information as to the whereabouts of Gregory Brundage. This information also was not investigated by defendants.

9. Defendant Hackett's suspicion that the plaintiffs were involved in the robberies was based entirely on the information that they had been with Schimel in the vicinity of the Fiat in the ramp, and that the Milwaukee police wanted three people.

10. At 5:50 a. m., three Milwaukee police officers arrived at the Madison police station and determined that plaintiffs were not the men sought by the Milwaukee police for the two robberies. Plaintiffs were released from custody shortly after 6:00 a. m. on September 10, 1975.

## Opinion

### I. Validity of the Arrests

#### A. Probable Cause

■ An arrest does not give rise to a cause of action for deprivation of civil rights under 42 U.S.C. § 1983 if it is made with a valid warrant or with probable cause. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).[4] The determination of probable cause, which is the constitutional criterion by which the legality of a warrantless arrest is measured, presents an important but often thorny is-

sue. In *Henry v. United States*, 361 U.S. 98, 100–102, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959), it was said (footnotes and citations omitted):

> The requirement of probable cause has roots that are deep in our history. * * And as the early American decisions both before and immediately after its adoption [the Fourth Amendment] show, common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest. And that principle has survived to this day. * * * Evidence required to establish guilt is not necessary. * * * On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. * * * It is important, we think, that this requirement be strictly enforced, for the standard set by the Constitution protects both the officer and the citizen.

And in *Wong Sun v. United States*, 371 U.S. 471, 479–480, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963), it was said (footnotes and some citations omitted):

> It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion * * *, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause—evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543—must be measured by the facts of the particular case. * * Whether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is ab-

---

affidavit to show that the affiant is competent to testify to that fact.

**4.** State law governs the requirements for a lawful arrest in a § 1983 action. *Mueller v. Powell*, 203 F.2d 797 (8th Cir. 1953). Wisconsin law

imposes the same criteria for a warrantless arrest as does the United States Constitution. See *West v. State*, 74 Wis.2d 390, 397–398, 246 N.W.2d 675 (1976); *United States v. Hoffman*, 251 F.Supp. 569, 574 (W.D.Wis.1966).

sent, they surely cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now existing for the procurement of arrest warrants would be destroyed. The threshold question \* \* \* is whether the officers could, on the information which impelled them to act, have procured a warrant for the arrest \* \* \*.

Defendants contend that probable cause for the arrests was provided by the fact that plaintiffs fit the general physical description of two of the three suspects and were found in the company of Mary Schimel, the third suspect, near the Fiat, an alleged instrumentality of the crime.[5] The parties dispute whether plaintiffs match the teletype descriptions of the robbery suspects. Defendants point to a general comparison, while plaintiffs emphasize specific differences. The most that can be said in defendants' favor on this point is that nothing in the description of Brundage could clearly exclude either of the plaintiffs, although the description of Miller's height and weight would rather clearly exclude both plaintiffs.

■ The most significant link between plaintiffs and the robberies is their association with Schimel and her automobile. But, the plaintiffs' acts of bringing Schimel to her Fiat and in setting out to assist her when the vehicle would not start are wholly consistent with innocence of criminal involvement. Defendants were not confronted with the choice of arresting plaintiffs or letting them escape surveillance. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an intermediate option was made available, as is explained in *Adams v. Williams*, 407 U.S. 143, 145–146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972):

In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.*, [392 U.S. at 22, 88 S.Ct. 1968.] The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.*, at 23, [88 S.Ct. 1868]. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. *Id.*, at 21–22, [88 S.Ct. 1868;] see *Gaines v. Craven*, 448 F.2d 1236 (CA9 1971); *United States v. Unverzagt*, 424 F.2d 396 (CA8 1970).

The appearance of plaintiffs with a suspect in a robbery at a car thought to have been involved in the crime may have created a reasonable suspicion to stop, frisk, and question plaintiffs. However, such suspicion does not rise to the level of probable cause and, therefore, does not justify the arrests.[6]

### B. Good Faith Defense

■ Defendants argue that even in the absence of probable cause, they are shielded from any liability arising from the September 10, 1975, arrests. Relying upon *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), defendants contend that the police teletype from Milwaukee furnished a legal justification for their actions. In *Whiteley*, a police officer, following an all-state police radio bulletin which named and described two burglary suspects, made a warrantless arrest of the petitioner and his companion. The arresting officer possessed no information indicating that

---

5. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) obviates the need to decide whether the Milwaukee police had probable cause to arrest Brundage, Miller or Schimel. See discussion *infra* at 597–598.

6. Wisconsin law is in accord with *Terry v. Ohio, supra.* See *Wendricks v. State*, 72 Wis.2d 717, 723, 242 N.W.2d 187 (1976) and *State v. Isham*, 70 Wis.2d 718, 727–729, 235 N.W.2d 506 (1975).

the arrested men had committed a crime. The Supreme Court determined that probable cause had not been established for the issuance of the warrant which was the basis for the police bulletin, and held that any arrest based upon the invalid warrant was illegal. *Id.* 401 U.S. at 568, 91 S.Ct. [1031] at 1037. In reaching this decision the Court acknowledged that the arresting officer was entitled to rely upon the radio bulletin:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.[7]

■ I agree that this passage suggests a civil defense for police officers who make arrests in reliance on communications from other police departments. The defense of "good faith and probable cause" announced in *Pierson v. Ray, supra,* 386 U.S. at 557, 87 S.Ct. 1213, established a qualified immunity for police officers in § 1983 actions. This defense has been reaffirmed in recent years. See *Scheuer v. Rhodes,* 416 U.S. 232, 245, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and *Wood v. Strickland,* 420 U.S. 308, 315–318, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In *Brubaker v. King,* 505 F.2d 534 at 536–537 (1974), the Seventh Circuit interpreted the good faith and probable cause defense as follows:

In *Pierson,* the Court explained how the two elements of good faith and probable cause were to be applied as a standard: "[I]f the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact unconstitutional." 386 U.S. at 557, 87 S.Ct. at 1219. The test, thus, under § 1983 is not whether the arrest was constitutional or unconstitutional or whether it was made with or without probable cause, but whether the officer believed in good faith that the arrest was made with probable cause and whether that belief was reasonable. (footnote omitted)

The defense thus consists of good faith and reasonable belief that probable cause existed for the arrest. Accord, *Tritsis v. Backer,* 501 F.2d 1021, 1023 (7th Cir. 1974); *Boscarino v. Nelson,* 518 F.2d 879, 881 (7th Cir. 1975); *Foster v. Zeeko,* 540 F.2d 1310, 1313 (7th Cir. 1976).

■ A close reading of *Whiteley* against the background of *Pierson* and *Brubaker,* reveals that a two-step determination is necessary to translate the *Whiteley* dicta into a § 1983 defense. First, defendants must prove that they did believe in good faith that the Milwaukee police dispatch itself was predicated upon probable cause, and that this belief was objectively reasonable. Second, defendants must prove that they did believe in good faith that plaintiffs were the suspects named in the police teletype, and this belief also was objectively reasonable.[8]

■ Summary judgment may be employed only if there is no genuine issue as to material facts and if the moving party is

---

**7.** Wisconsin decisions agree with *Whiteley* that a police officer may depend upon police communications in making an arrest. See *State v. Taylor,* 60 Wis.2d 506, 210 N.W.2d 873 (1973); *State v. Mabra,* 61 Wis.2d 613, 213 N.W.2d 545 (1974); *State v. Shears,* 68 Wis.2d 217, 229 N.W.2d 103 (1975); *Johnson v. State,* 75 Wis.2d 344, 249 N.W.2d 593 (1977); and *Schaffer v. State,* 75 Wis.2d 673, 250 N.W.2d 326 (1977). However, it must be established that the collective information within the police de-

partment at the time of the arrest constituted probable cause, even though insufficient information was possessed by the arresting officer himself or herself at the time of the arrest. *Mabra, supra* 61 Wis.2d at 625–26, 213 N.W.2d 545.

**8.** In both *Whiteley, supra* and *Taylor, supra,* the persons whom the police arrested were in fact the persons named in the dispatches.

entitled to judgment as a matter of law. Federal Rules of Civil Procedure 56; *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972). A litigant is entitled to judgment as a matter of law only "where it is quite clear what the truth is . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). The record before the court must be adequate to support a decision of the legal issues presented by a motion for summary judgment. *Moore's Federal Practice* § 56.16 at 637. Denial of summary judgment is appropriate where resolution of the issues requires a more fully developed record of the facts and circumstances. *Askew v. Hargrave*, 401 U.S. 476, 479, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). Moreover, cases involving states of mind frequently present obstacles to disposition on a pre-trial motion. 10 Wright & Miller, *Federal Practice and Procedure* (1973) § 2730 at 583–584. A § 1983 action raising the defense of a good faith and reasonable belief falls into this category. *Shifrin v. Wilson*, 412 F.Supp. 1282 at 1295 (D.C.D.C.1976).[9]

■ The record here on the motions for summary judgment justifies the conclusion that defendants believed, in good faith, that the police bulletin from Milwaukee was itself predicated upon probable cause, and that such belief was reasonable. The factual record poses problems, however, in resolving the second step of the § 1983 defense. There is little doubt that, at the moment of the arrests, defendant Retelle believed in good faith that plaintiffs were Brundage and Miller. Whether it was objectively reasonable to believe that plaintiffs were the suspects is far less clear. The available descriptions of Brundage and Miller were scant. The record is deficient

concerning the length of time during which defendant Retelle observed the plaintiffs at the ramp, and the distances between the plaintiffs and the point of observation, and the lighting in the ramp. The deficiencies in the record prevent the granting of summary judgment on the applicability of the defense of a good faith and reasonable belief to plaintiffs' claim of false arrest.

## II. Validity of the Detentions

■ In Wisconsin the tort of false imprisonment is defined as the unlawful restraint by one person of the physical liberty of another. *Lane v. Collins*, 29 Wis.2d 66, 69, 138 N.W.2d 264 (1965). It is a modern derivative of the historical action of trespass and as such is classified as an intentional tort. *Strong v. Milwaukee*, 38 Wis.2d 564, 568, 157 N.W.2d 619 (1968). Prosser has written that

> . . . as in the case of other intentional interferences with person or property, an innocent, and quite reasonable, mistake as to his identity will not avoid liability. Although intent is necessary, malice, in the sense of ill will or a desire to injure, is not. There may be liability although the defendant believed in good faith that the arrest was justified, or that he was acting for the plaintiff's own good.

Prosser, *Law of Torts* (3rd ed.), p. 61, sec. 12 quoted in *Strong, supra* at 567, 157 N.W.2d 619.

This view is shared by Harper and James:

> Malice or ill will or bad motive is unnecessary and the defendant may be liable although he acted under a reasonable but mistaken belief that he was privileged to imprison or arrest the plaintiff. Nor will a mistake in the identity of the plaintiff constitute a defense. His intention to confine another person will make him liable to the person actually confined al-

---

**9.** Compare *Kellerman v. Askew*, 541 F.2d 1089 (5th Cir. 1976); *Walker v. Cahalan*, 542 F.2d 681 (6th Cir. 1976); *Navarette v. Enomoto*, 536 F.2d 277 (9th Cir. 1976); and *Sartin v. City of Columbus Util. Comm'n*, 421 F.Supp. 393 (N.D. Miss.1976) holding grants of summary judgment in § 1983 actions improper where a good faith defense was asserted, with *White v. Boyle*, 538 F.2d 1077 (4th Cir. 1976); *Brubaker v. King, supra*; and *Jones v. United States*, 536 F.2d 269 (8th Cir. 1976) affirming grants of summary judgment in § 1983 actions involving a good faith defense.

though there is no desire or intent on the part of the defendant to harm the plaintiff.

1 Harper and James, *Law of Torts*, p. 228, sec. 3.7 quoted in *Strong, supra* at 568, 157 N.W.2d 619.

 The United States Supreme Court has indicated that § 1983 is to be read against the background of tort liability. *Pierson v. Ray, supra,* 386 U.S. at 556, 87 S.Ct. 1213. While this instruction suggests a general approach to § 1983 actions, it does not mean that tort rules should be imposed inflexibly upon civil rights litigation. The principles announced by Prosser, Harper and James clash with the spirit of the defense of a good faith and reasonable belief. It would be inconsistent to deny police officers a qualified immunity against liability for a detention following an arrest made without a warrant or probable cause and, at the same time, allow a qualified immunity against liability for the unlawful arrest itself. Therefore, I hold that the defendants will be protected from liability for the § 1983 claim of false imprisonment if they prove a good faith and reasonable belief concerning the legality of both the detention and the verification procedure used to identify the plaintiffs.[10] See *Bryan v. Jones,* 530 F.2d 1210, 1214 (5th Cir. 1976); *Miller v. Jones,* 534 F.2d 1178, 1179 (5th Cir. 1976); *Stephenson v. Gaskins,* 539 F.2d 1066, 1067–1068 (5th Cir. 1976).

**10.** Both plaintiffs and defendants cite *Wallner v. Fidelity & Deposit Co.,* 253 Wis. 66, 33 N.W.2d 215 (1948) on the liability of police officers for the tort of false imprisonment. I read *Wallner* as holding that a police officer who is armed with a warrant for the arrest of A is required to exercise a certain degree of caution in determining whether the person to be arrested and imprisoned is indeed A, and that when this degree of caution is not exercised and it is B who is arrested and imprisoned, the officer is civilly liable to B. I consider this holding consistent with permitting the defense of a good faith and reasonable belief in a § 1983 action.

**11.** The possibility of liability for false imprisonment attaching automatically upon a finding of liability for false arrest is limited to situations where, as here, the arresting officer also acted

### Retelle

 The disposition of the false imprisonment claim against defendant Retelle will depend, in part, upon the resolution of the defense of a good faith and reasonable belief concerning the arrests. Retelle participated in both the arrests and the incarcerations of plaintiffs. If Retelle does not establish that, at the time of the arrests, he possessed a good faith and reasonable belief that plaintiffs were Brundage and Miller, then liability for the subsequent detentions will attach automatically.[11] Because determination of Retelle's liability for false imprisonment may rest upon the outcome of the claim of false arrest, the same uncertainties in the present record that prevent decision of his liability for false arrest preclude decision of his liability for false imprisonment.[12]

### Hackett

For defendant Hackett, the question of liability for false imprisonment is separate and distinct from that for false arrest. In contrast to Retelle, Hackett did not take part in the actual arrests. Without expressly confronting the issue, the Seventh Circuit has assumed that investigative officers, not participating in an actual arrest, can be sued for false arrest. See *Tritsis v. Backer, supra,* and *Brubaker v. King, supra.* However, these cases are clearly distinguishable from the case at bar. In *Tritsis* and *Brubaker* the defendants, unlike Hackett, helped to procure, instigate, encourage

as jailer by participating actively in the incarceration of the arrestees. Absent explicit involvement in the imprisonment or other unique facts, I would hesitate to impose a continuing duty upon the arresting officer to insure the validity of the detention.

**12.** Assuming that Retelle proves that at the time of the arrest, he had a good faith and reasonable belief that plaintiffs were Brundage and Miller, he may nevertheless be found liable for the ensuing imprisonment. An unlawful detention following a valid arrest can constitute false imprisonment. *Luker v. Nelson,* 341 F.Supp. 111, 120 (N.D.Ill.1972). The following discussion with respect to defendant Hackett concerning false imprisonment is generally applicable also to defendant Retelle.

or cause the unlawful arrests in accordance with general principles of tort law. See Prosser, *The Law of Torts* § 11 at 47. Their activities were essential to effectuating the challenged arrests. In the instant case, Hackett's participation in the investigation was peripheral to the apprehension of the plaintiffs.[13]

More importantly, neither *Tritsis* nor *Brubaker* involved an arrest where, as here, the wrong persons were apprehended. In *Tritsis* the plaintiff attacked the sufficiency of the information submitted to obtain the arrest warrant, and in *Brubaker* the plaintiff argued that there was insufficient evidence to show he had knowledge of the existence of an unlawful substance. Here the core of the plaintiffs' claim of false arrest addresses the mistaken identification made by the police officers at the time of the arrests at the Lake Street ramp. Hackett's role in the police operation in no way contributed to or affected this error. Thus, Hackett cannot be held responsible for any wrongdoing in connection with the arrests. Instead, his liability must rest solely upon the claim of false imprisonment.

The crux of plaintiffs' false imprisonment argument is that defendant Hackett continued the incarceration unreasonably. In a challenge to a detention, unreasonable and unnecessary delay is determined from the facts and circumstances of each case. *Czap v. Marshall*, 315 F.2d 766 (7th Cir. 1963), cert. denied, 375 U.S. 942, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963).[14] If the validity of the imprisonment turned entirely upon the validity of the decision to await the arrival of the Milwaukee police, rather than to telephone plaintiff Honzik's father in Milwaukee, I would be prepared to grant summary judgment to the defendants.[15] But the validity of the imprisonment is affected by other factors as well.

Few federal decisions address the duty of a jailer to assure that the person in his or her custody has been properly arrest-

---

**13.** In his deposition, Hackett testifies that his title was "Detective Supervisor." However, there is no evidence in the record to indicate that Hackett was in charge of the investigation or the arrests. Another police officer Captain Fred Ball, is reported by defendant Retelle, in his deposition, as being in charge of the arresting officers. Hackett received the teletype descriptions of Brundage and Miller from Milwaukee and called the Milwaukee police after the arrests to confirm plaintiffs' identities. He also checked a house at a Madison address and then went by the parking ramp where the Fiat was discovered.

In contrast the defendants in *Tritsis* engaged in undercover work, such as buying guns and checking federal firearm licensing files, that was critical to carrying out the arrests for illegal transfer of firearms. One of the agents also obtained the arrest warrant which another officer executed. Likewise, in *Brubaker*, the work of federal customs and postal agents was indispensable to the subsequent narcotics arrests. One agent left a notice of mail delivery at the plaintiff's home and another maintained surveillance of the post office which enabled local police to make the arrest.

Further support for the conclusion that defendant Hackett cannot be held liable for the arrests is found in *Rodriguez v. Ritchey*, 539 F.2d 394 (5th Cir. 1976), which followed *Tritsis, supra,* and *Brubaker, supra.* There the grant of summary judgment in favor of two FBI agents was affirmed on the ground that their actions did not cause the appellant's arrest. One officer had monitored wiretaps, and his logs aided another agent in identifying the appellant for arrest. The court also found that the supervision of the agent in charge of the police operation did not cause the arrests and therefore that this agent could not be liable for the arrest.

**14.** In *Czap v. Marshall* the plaintiff sued a county sheriff for false arrest and imprisonment claiming, *inter alia,* an unreasonable delay by defendants in bringing him before a magistrate. The court found the plaintiff's claim to be without merit where he was arrested in mid-afternoon on a Sunday and discharged by the district attorney at noon the following day without a complaint being filed against him.

**15.** Defendants were not obliged to accept plaintiffs' assertions that they were not the suspects sought by the Milwaukee Police Department. Nor were defendants required to accept plaintiffs' driver's licenses as positive identification. The Milwaukee officers arrived in Madison approximately two and a half hours after plaintiffs' arrests. Plaintiffs were released about ten minutes after the arrival of the Milwaukee police. Perhaps identification by plaintiffs' relatives would have been more reliable than identification by the Milwaukee police, perhaps less. But it is improbable that it could have been accomplished in substantially less time.

ed.[16] Nonetheless, I believe that when acting as a jailer, a police officer cannot ignore facts which suggest that he or she may be imprisoning the wrong person. While not a participant in the arrests, Hackett knew the descriptions of the robbery suspects and heard plaintiffs' continuing protests that they were not Brundage or Miller. Hackett also had ample opportunity to compare the appearances of plaintiffs with the police profiles of Brundage and Miller to determine whether he had a legal basis to hold plaintiffs. Given the discrepancies between the physical characteristics of plaintiffs and those of the suspects, especially Miller, this determination is important for evaluating the legality of the detention.

 The requirement that Hackett reasonably believed plaintiffs to be Brundage and Miller is similar to, but not the same as, the showing of a good faith and reasonable belief that probable cause existed for the initial arrests. It does not entail consideration of all the circumstances surrounding the arrest, but it does entail consideration of the physical setting at the police station in which Hackett could observe the plaintiffs' appearance, and it requires a judgment whether Hackett had sufficient information to justify the continuing incarceration of plaintiffs as the robbery suspects. Hackett may have possessed such information. However, the sparse nature of the descriptions of Brundage and Miller presented thus far to the court, which hinders disposition of the false arrest and false imprisonment claims against Retelle, also prevent decision of the allegations against Hackett.

16. In *Czap v. Marshall, supra,* at 770, the Seventh Circuit suggested that a deputy sheriff, who had nothing to do with an arrest but who placed a person in jail and locked him in a cell after that person had been brought to the jail as the result of a lawful arrest, would not be liable for false imprisonment on the basis of those acts alone. This statement presupposes a valid arrest and thus sheds no light on the issue now before me. It is also dictum; the deputy sheriff in *Czap* was proved not to have been the officer present at the jail at the time of the plaintiff's incarceration.

*Order*

It is ordered that plaintiffs' motion for summary judgment is granted only on the issue that defendants lacked probable cause for the arrests of the plaintiffs.

It is ordered that the remainder of plaintiffs' motion for summary judgment is denied.

It is ordered that defendants' motion for summary judgment is granted only on the issue that defendant Hackett is not liable for the arrests of the plaintiffs.

It is ordered that the remainder of defendants' motion for summary judgment is denied.

In *Bryan v. Jones,* 530 F.2d 1210 (5th Cir. 1976), the plaintiff was wrongfully imprisoned for over a month due to a typographical error. Holding that the defense of a good faith and reasonable belief applies to a § 1983 claim for false imprisonment, the court concluded that a jailer who negligently establishes a record keeping system in which errors are likely will be held liable for a false imprisonment resulting from such errors. Like *Czap,* this case is not on point.